AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
### WESTERN DISTRICT OF NORTH CAI

FILED
CHARLOTTE, NC

JUL 3 0 2015

U.S. DISTRICT COURT
WESTERN DISTRICT OF NC

|  |  |
|---|---|
| United States of America | ) |
| v. | ) |
|  | ) Case No. 3:15mj 285 |
| CHRISTOPHER TODD CAMPBELL | ) |
|  | ) |
|  | ) |
| _____ | ) |
| Defendant(s) | |

UNDER SEAL

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ____February 1, 2015 - to present____ in the county of _____Gaston_____ in the ____Western____ District of ____North Carolina____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 18, USC Section 921(a)(4)(A) | Making it unlawful for any person other than a licensed dealer to transport in interstate commerce any destructive device as defined to include any explosive, any combination of parts either designed or intended for use in converting any device into a any destructive device and from which a destructive device may be readily assembled; |
| Title 26, USC Section 5861(d)& (f) | Making it unlawful for any person to receive, possess or make a firearm, or destructive device, that is not registered to him in the National Firearms Registration |
| Title 18, USC Section 371 | Making it unlawful for two or more persons to conspire against the U.S. |

This criminal complaint is based on these facts:

See Attached Affidavit of Task Force Officer Mark S. Kozen in Support of Criminal Complaint, incorporated by reference herein.

Certified to be a true and correct copy of the original.
U.S. District Court
Frank G. Johns, Clerk
Western District of N.C.
By: _____
Deputy Clerk
Date 7/30/15

☑ Continued on the attached sheet.

_____
Complainant's signature

____Mark S. Kozen, Special Agent, TFO/FBI/JTTF____
Printed name and title

Sworn before me and signed in my presence.

Date: __7/30/15__

_____
Judge's signature

City and state: ____Charlotte, North Carolina____

____U.S. Magistrate Judge David C. Keesler____
Printed name and title

# ATTACHMENT C

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT
## AND APPLICATIONS FOR SEARCH WARRANTS

Affiant, Mark S. Kozen, a Special Agent (SA) with the Federal Air Marshal Service and a

Task Force Officer (TFO) with the Federal Bureau of Investigation (FBI) Joint Terrorism Task

Force (JTTF), being duly sworn, depose and states:

1.    Affiant has been a federal law enforcement officer since June 1992.   He is currently assigned

to the JTTF in the Charlotte Division of the FBI.   He has been assigned to the JTTF for

approximately two and one half years.   In his current capacity, he is assigned to

investigations involving domestic terrorism related offenses.   Prior to being assigned to the

FBI JTTF, Charlotte Division, he was assigned to the Charlotte, N.C., and Philadelphia, PA.,

field offices of the Federal Air Marshal Service.   Affiant has been the case agent, co-case

agent, or participating agent on numerous domestic terrorism and aviation related

investigations during his law enforcement career and has received training in such

investigations during his prior law enforcement career and training at the FBI Joint Terrorism

Task Force Operations Course at the FBI Academy in Quantico, Virginia.   Affiant's training

has continued through numerous in-service training seminars and courses during his career as

a Special Agent / Federal Air Marshal.   He has participated in various methods of

investigation, including, but not limited to, undercover operations and the use of undercover

agents, consensual monitoring, physical surveillances, interviews of witnesses and

defendants, the use of search warrants, the use of seizure warrants, the use of confidential

informants, the use of pen registers, and the use of intercepted wire communications.

2.    The facts in this affidavit come from Affiant's personal observations, training and experience,

and information obtained from other agents and witnesses.   This affidavit is intended to show

merely that there is sufficient probable cause for the requested warrants and does not set forth all of Affiant's knowledge about this matter.

## PURPOSES OF THIS AFFIDAVIT

3.    This Affidavit is submitted in support of the following requests:

   a.    A complaint and warrant for the arrest of Christopher Todd Campbell ("CAMPBELL"); and

   b.    Applications requesting warrants to search the following:

   i.    A residence located at 303 Rankin Avenue, Mount Holly, North Carolina, wherein CAMPBELL and his wife Alison Taylor Richmond and two children (Wyatt and Paisley) reside (hereinafter the "Campbell Residence"), further described in Attachment A to the Campbell Residence Application and Warrant;

   ii.    Capone's Parlor located at 6412 Wilkinson Blvd., Belmont, North Carolina, owned and operated by CAMPBELL (hereinafter "the Tattoo Parlor", further described in Attachment A to the Capone's    Parlor Application and Warrant; and

   iii.    A mobile telephone used by CAMPBELL with cellular telephone number 704-215-2600, Serial Number 256691459500034136 subscribed to by CAMPBELL (hereinafter "Campbell's cellphone").

## SUMMARY OF PROBABLE CAUSE

4.    Affiant declares that the facts detailed in this Affidavit provide probable cause to believe that beginning no later than February 1, 2015, and continuing until the present, CAMPBELL and

2

others have been illegally manufacturing destructive devices as defined Title 18, United States Code, Section 921(a)(4)(A) and Title 26, United States Codes, Section 5845(a) & (f) by reconstructing dummy grenades into live grenades. Beginning no later than July 29, 2015, LITTERAL joined in CAMPBELL's plan to make live grenades by instructing him on how to make the grenades that could be set off by a tripwire. In particular, Affiant has probable cause to the believe the following statutes have been violated:

a.   Title 18, United States Code, Section 922(a)(4), making it unlawful for any person other than a licensed dealer to transport in interstate commerce any destructive device as defined in Title 18, United States Code, Section 921(a)(4)(A). Section 921(a)(4)(A)(i), (A)(ii), and (C) defines destructive device to include any "explosive ... (i) bomb, (ii) grenade" and (C) "any combination of parts either designed or intended for use in converting any device into a any destructive device [such as an explosive bomb] and from which a destructive device may be readily assembled."

b.   Title 26, United States Code, Sections 5861(d), making it unlawful for any person to receive or possess a firearm as defined in Title 26, United States Code, Section 5845(a) and (f), that is not registered to him in the National Firearms Registration and Transfer Record. Title 26, United States Code, Section 5845(a)(8) defines a "firearm" to include a destructive device. Section 5845(f) defines the term "destructive device" to include "(1) any explosive (A) bomb."

c.   Title 18, United States Code, Section 371, making it a crime if two or more persons to conspire, confederate or agree to violate the laws of the United States.

3

5. For the reasons stated herein, there is probable cause to believe that searches of the Campbells' residence and any area within the curtilage of the residence, the Tattoo Parlor and any areas within the curtilage of the business premises, and Campbell's cellphones, will lead to evidence, fruits and instrumentalities of the aforementioned crimes as well as to the identification of individuals who are engaged in the commission of those and related crimes.

## FACTS ESTABLISHING PROBABLE CAUSE

6. On or about June 18, 2015, FBI Special Agents and members of the JTTF—including your Affiant—received information from a confidential human source (hereinafter "CHS #1") concerning individuals with extreme and potentially violent anti-government views attempting to purchase, acquire and possess smokeless gun powder and other items to be utilized in the manufacturing of explosive or destructive devices. In addition, the same individuals had been purchasing military equipment such as .338 ammunition for use in a Lapua .338 caliber rifle, gunpowder, dummy grenades, as well as such as handheld radios with throat microphones for communication, military issue Kevlar helmets and body armor vests with front and rear ceramic plates. According to CHS#1, these persons are preparing to use lethal force against United States government forces in order to defend against the imposition of martial law or other perceived infringements on their rights. CHS #1 who operates a military surplus store in Gaston County, North Carolina, has provided reliable information to the FBI in the past. CHS #1 has not received any monetary compensation for his/her information.

7. CHS #1 has stated that he/she began providing information to the FBI regarding this matter due to his/her concern for public safety. CHS #1 met CAMPBELL shortly after he/she

4

moved his/her store in January 2015 to Belmont, North Carolina, a few doors from where CAMPBELL operates his Tattoo Parlor. CAMPBELL stated his violent anti-government views almost immediately upon meeting CHS #1. In and around February 2015, CAMPBELL introduced Walter Eugene Litteral ("LITTERAL") to CHS #1. LITTERAL and CAMPBELL stated their belief that the federal government intended to use the armed forces to impose martial law in the United States, which they and others would resist with violent force. LITTERAL and CAMPBELL began purchasing items from CHS#1's store to prepare for such an attack in March and April 2015. By June 18, 2015, LITTERAL began stating specifics to CHS#1 on how he was going to manufacture destructive devices and CHS reported this information to the FBI who opened an investigation. On or about July 22, 2015, CAMPBELL told CHS#1 that he has been using various methods to a convert dummy grenade and smokeless gunpowder he had received from CHS#1 in February 2015 into a live grenade.

8. Under federal law, explosive devices must be licensed and can only be legally manufactured and transported by licensed manufacturers and dealers. Affiant has consulted with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), the agency that regulates firearms and explosives in the United States. ATF has searched its records and found no listing that CAMPBELL or his wife are licensed explosive dealers or manufacturers. Moreover, ATF has advised that while it is legal for an unlicensed person to possess and store smokeless gun powder for the purpose of reloading small arms ammunition; once someone intends to use smokeless gun powder for something other than small arms ammunition—like a bomb or fireworks—the exemption does not apply. The small arms ammunition

5

exemption is found in Title 18, United States Code, Section 845(a)(4). Smokeless powder is listed as an explosive material in the ATF "List of Explosive Materials." Typically, smokeless powder is considered a low explosive. Low explosives are required by ATF regulations to be stored at a minimum in a "Type 4 magazine." The construction requirements of a Type 4 magazine can be found in 27 CFR 555.210. Even if explosive materials are stored in a magazine, they still may not be stored in a residence or dwelling.

9.  Even though CAMPBELL is not a licensed manufacturer of explosive devices, he has demonstrated knowledge on how to reconstruct a dummy grenade, including plugging the manufactured holes in the container, loading it with an explosive, and attaching an ignition device and primer. In Affiant's experience, instructions on how to rebuild grenades and make other explosive devices can be found on the Internet. LITTERAL and CAMPBELL have discussed learning how to build smoke grenades on YouTube. LITTERAL has also told CHS#1 to email him at genelitteral@gmail.com.

10. LITTERAL and CAMPBELL discussed with CHS#1 their disapproval of the "Jade Helm" military exercises in the Southwestern United States and believe the exercise is a cover for the imposition of martial law in the United States. Jade Helm is a multi-state military training exercise taking place July 15 through September 15, 2015, involving members of U.S. Special Operations Command and service members from the military's four branches. While the exercise is taking place across seven states, the Special Operations Forces are only actively training in five states: Texas, Arizona, New Mexico, Utah and Colorado. The majority of the exercise will be conducted in Texas where according to open source records show

6

LITTERAL's son resides. LITTERAL requested that he receive the military items he ordered from CHS#1 no later than July 15, 2015.

11. On June 30, 2015, CHS #1 advised that CAMPBELL had entered his/her military surplus store and purchased a Kevlar helmet, boots, and a military ruck sack. CAMPBELL also said that he was going to bring his wife back at a later time for some items. CAMPBELL stated that "shit is gonna go down soon." Based on discussions with CHS #1, Affiant believes that CAMPBELL was referring to the belief that the government would soon declare martial law. CAMPBELL advised CHS #1 that he and LITTERAL have a base camp located on 99 acres of land in Clover, South Carolina. According to CAMPBELL, he and LITTERAL intend to booby-trap the camp and draw government's forces into the camp and kill them. CHS #1 also stated that approximately one month ago CAMPBELL purchased one pound of gun powder from his/her store. This conversation was not recorded and is based upon reporting from CHS #1 to the FBI.

12. On July 3, 2015, LITTERAL contacted CHS #1 via text and asked CHS #1 to call him. When CHS #1 called Litteral's cellphone, LITTERAL advised him/her that he wanted to purchase four balaclavas from CHS #1. (A balaclava is a form of cloth headgear, like a ski mask, designed to expose only parts of the face.) Later that day, LITTERAL arrived at the military surplus store to purchase the balaclavas. While at the store, LITTERAL also told CHS #1 that CAMPBELL will give him/her the location of their base camp. LITTERAL expressed concern that CAMPBELL is "too high strung" and that he can't protect his family with someone like CAMPBELL "in our group." This conversation was not recorded by CHS #1, but was reported to the FBI.

7

13. On or about July 29, 2015, records were obtained pertaining to CAMPBELL's 2011 arrest for kidnapping, aggravated assault and possession of marijuana. The victim, then a friend of CAMPBELL's, told law enforcement that he was lured by an invitation to "party" to CAMPBELL's tattoo shop—then in a different lotion—where CAMPBELL also then lived in a travel trailer. When the victim arrived at CAMPBELL's trailer, CAMPBELL asked to see the victim's new tattoo. According to the victim, when he pulled up his shirt, CAMPBELL punched him repeatedly in the face and head with brass knuckles. Hospital records confirm that the victim suffered a broken nose, chipped tooth and a concussion. Although these offenses were later pled down to a misdemeanor assault, it demonstrates that CAMPBELL can be violent. In a previous unrecorded conversation between the CHS and CAMPBELL, CAMPBELL told the CHS he would kill anyone who messed with "Geno" a/k/a LITTERAL).

**CAMPBELL's Possession of Destructive Device(s):**

14. On July 21, 2015, in a court ordered recorded phone conversation using LITTERAL's cellphone, CAMPBELL told LITTERAL, "I got four of them smoke grenades that we liked. I got him ordering a bunch more so in case you wanted to grab some." Additionally, LITTERAL stated to CAMPBELL, "I gotta get with _____ daggone and tell him to send me that cuz when I erased my damn uh texts I erased them links where he was had them make the homemade smoke grenades out of them." CAMPBELL responded, "Oh oh oh yeah I have a couple on my phone too."

8

15. On July 22, 2015, in a consensually recorded conversation in a military surplus store in Gaston County, North Carolina, CAMPBELL was looking at items in the store and asked CHS#1 "Are those blast caps?" Later in the conversation, while discussing a dummy hand grenade that CHS#1 had previously sold to him, CAMPBELL states "Yeah I got it all plugged together. It's just not armed yet. All I gotta do is put a blasting cap in it." Later CAMPBELL in reference to blasting caps stated: "I've been using the reloads for 12 gauges. That's what I've been using." CHS #1 asks "You tried it? It works?" CAMPBELL replies "I haven't exploded one. I should just put a cap in one and bust it to see if it'll work. You know without the powder."

16. Also in this July 22, 2015 conversation, CAMPBELL states: "I got a trigger housing from over there. I'm gonna try it in one of these. I got a spoon over there. Put a blasting cap in it make sure it works." CAMPBELL further states that using a 12 gauge shell or a shotgun reload cap "Those fit it in perfect." CHS#1 asks if CAMPBELL is using a dummy grenade that CHS#1 had previously sold him and CAMPBELL replies "Uh, yeah." When CHS#1 mentions that there is a hole in the bottom of the grenade, CAMPBELL states: "Yeah but you just tap it. You tap and die it. You put fuckin uh grunt tape on it, make it really air tight and screw it back up in there and it pressurizes it. Hopefully the ass end'll blow out though and it'll shrapnel." From reviewing the video tape and discussions with CHS#1, Affiant believes that CAMPBELL was referring to his tattoo shop when he said he had a trigger housing "over there."

17. On July 29, 2015 in a consensually recorded conversation in a military surplus store in Gaston County, North Carolina between CAMPBELL and CHS #1, CAMPBELL was observed

9

showing CHS #1 the shotgun primer and housing system from a previously used smoke grenade. CHS #1 asked CAMPBELL if "this is the one like the one you got on at your house?" and CAMPBELL replied, "Uh huh." CAMPBELL also states, "This one all it needs is a primer. The other ones already got primers and everything. This is the one I'm building. The other ones already built." Additionally, when describing how to re-pin a grenade CAMPBELL states, "Once you get it in there you take the spoon and put it back on. And then these holes will line up." He continued, "but, your primers in there. You gotta do all this before you arm it ya know what I mean so that way if it does blast it just goes pink." Affiant reviewed the recording and believes that when CAMPBELL describes the blast, he says "pink" in a high pitched voice leading affiant to believe the blast would be very minor.

18. During the consensually recorded conversation on July 29, 2015 in CHS#1's shop, joined in CAMPBELL's conversation with CHS#1 about CAMPBELL'S grenades. appeared to be familiar with this topic. CAMPBELL advised CHS #1 in presence that it he was making a trip grenade and that there is no fuse. CHS #1 asked CAMPBELL if he already threaded one and put it together and CAMPBELL replied, "yeah." CAMPBELL stated to CHS #1 that he would empty the powder out and bring it to the store. stated: "oh you armed it" and CAMPBELL replied, "I got it all ready except for the primer needs to be dropped in" then said, "so it's not armed armed" and CAMPBELL replied, "armed armed, no. Ready, yes." CAMPBELL also advised that this grenade is in his aluminum gun safe at his residence. When discussing threading the grenade to accept an ignition device, CAMPBELL stated that he has "a micron over there and everything and I got a tap and die

10

set." When making this statement, it appears that CAMPBELL is pointing over his shoulder towards the direction of his Tattoo Parlor. As with CAMPBELL's prior conversation in CHS #1's store, Affiant believes that CAMPBELL was referring to the tattoo parlor when he stated "over there." (Taps and dies are tools used to create screw threads which are called threading. Many are cutting tools; others are forming tools. A tap is used to cut or form the female portion of the mating pair. A die is used to cut or form the male portion of the mating pair. The process of cutting or forming threads using a tap is called tapping, whereas the process using a die is called threading)

19. When discussing the grenades and shotgun primers _____ stated, "Are you talking about shotgun primer"? He then advises CAMPBELL that there is a gun show next month and shotgun primers can be purchased. _____ tells CAMPBELL, "I'll pick you up some 12 gauge primers". He then tells CHS #1 that he doesn't want to see CAMPBELL trying to tap live primers out and that it scares him. Later in the conversation, CAMPBELL indicates that he would like to see Geno's arsenal to which _____ replied, "I don't want to see it because if I don't see it I don't have to testify." At approximately 12:40, CAMPBELL and _____ departed the store.

20. At approximately 15:14, _____ was observed back in the store with CHS #1. CHS #1 asked _____ if Chris got the primer out. _____ replied, "Fuck I don't know, he makes me nervous." CHS #1 asked _____ "What's he wanting to do oh for the . . ." _____ replied, "I don't know I quit listening dude. You cannot be called to testify if you don't fucking know."

11

21. FBI Special Agent Bomb Technicians have opined that if CAMPBELL assembled these components as described herein, CAMPBELL would possess an explosive device as defined in Title 18, United States Code, Section 921(a)(4)(A) and Title 26, United States Code, Section 5845(a) and (f). Even if CAMPBELL did not assemble the device, he would possess "a combination of parts from which a destructive device could be readily assembled— a violation of 18 USC § 921(a)(4)(C).

22. In addition, Affiant is aware that most, if not all, components of the grenade being constructed by CAMPBELL have been transported in interstate commerce. Affiant has reviewed a receipt provided by CHS#1 which shows that the dummy grenade provided to CAMPBELL was purchased from a vendor in Indiana and shipped in interstate commerce to CHS#1's shop in North Carolina. Likewise, CHS#1 has stated that the smokeless gunpowder he provided to CAMPBELL originated from Aliant Powder in Lewiston, Indiana. The shotgun shell provided to CAMPBELL by CHS#1 was manufactured by Federal, which is headquartered in Minnesota and has no manufacturing facilities that produce this particular shell in North Carolina. In addition, CAMPBELL has stated that his intention is to booby trap his and LITTERAL's base camp near Clover, South Carolina.

**LITTERAL advises CAMPBELL in how to make destructive devices:**

23. Beginning in and around May 1, 2015, and continuing until the present, LITTERAL has discussed with CHS#1 his own plans and efforts to make pipe bombs from gunpowder purchased from CHS#1. LITTERAL has told CHS#1 that he has obtained pipes to make the bomb and plans to use M-80 fireworks as an ignition device. Court ordered intercepted conversations between BARKER and LITTERAL on LITTERAL's cellphone show that

12

BARKER is supplying LITTERAL with pipe fittings necessary to close off the pipe bombs LITTERAL is constructing. Court ordered intercepted conversations between BARKER, LITTERAL and others also show that LITTERAL attempted to purchase an AR 15 assault rifle for BARKER who is a convicted felon and is providing BARKER with prescription drugs such as hydrocodone. Recent conversations between LITTERAL and CAMPBELL show that CAMPBELL is aware of LITTERAL's conduct and may be willing to participate with him in this illegal conduct.

24. On July 25, 2015, in a court ordered recorded call between LITTERAL and CAMPBELL, LITTERAL told CAMPBELL that he needs to come up with some extra money and asked if some other individuals would want to "take part in this deal. If they want I got uh some of those yellows." CAMPBELL advises LITTERAL, "I'll throw you some loot for the ones you gave me yesterday too and I might grab a couple more." LITTERAL replies, "that's ok big dawg, I mean if you don't have anything, you know, if you can't get rid of anything, I ain't gonna worry about it." CAMPBELL replied, "Well if you just bring me like four then we'll call it even." He later says, "cause that will last me for like a week you know what I mean, cause you already gave me those other ones." Based on this call and other investigation of LITTERAL, Affiant believes that LITTERAL was offering CAMPBELL an opportunity to illegally purchase prescription drugs, which offer CAMPBELL accepted. CHS #1 has observed CAMPBELL and others smoking marijuana behind CAMPBELL's tattoo shop.

25. On July 29, 2015, at about 16:19, LITTERAL arrived at CHS #1's store. CAMPBELL and Byrson had departed and only CHS #1 was present. CHS#1 described CAMPBELL's grenade to LITTERAL and said CAMPBELL wanted to know if it would work. LITTERAL

13

said "if it's for tripwires, it will." LITTERAL continued, "If it's for trip wires it will work perfect because that's all you need you just need it where it will release that spoon comes down and hits that primer." LITTERAL also advises CHS #1 that the design they are discussing would work well in a pipe bomb if it was going to be used for a trip. LITTERAL then states, "but see I don't want, these pipe bombs are going designed to put where I need them." Affiant believes that LITTERAL meant he was not designing his pipe bombs to be used as trips. (The terms "tripwire" and "trips" describes a passive triggering mechanism for an explosive device. Typically, a wire or cord is attached to an improvised explosive device (IED) such as a land mine and arranged so that when it is snagged or pulled, the device is triggered and explodes.)

26. At approximately 16:35, LITTERAL and CHS#1 walked to CAMPBELL's Tattoo Parlor to talk with CAMPBELL about his grenades. In a consensually recorded conversation at the Tattoo Shop, CAMPBELL described how he wanted to make a pipe bomb. CAMPBELL then went to the back of the shop and retrieved an igniter and primer, which he showed to LITTERAL and CHS#1. CAMPBELL stated, "and then you can make trip pipe bombs." CAMPBELL said, "there's no fuse on this." He continued, "This is trip. But what if we did that and glued a fuse to the bottom of that primer and then gave it about ya know a four inch drop down, 3 inch dropdown and then put foam inside the grenade." LITTERAL then described to CAMPBELL how it has to be compressed. LITTERAL stated, "I've got to have compressed powder from here down and in order to bring that fuse down here what am I going to do with my empty air space here." CAMPBELL explained that he was thinking about filling it with foam or plaster. LITTERAL responded, "it's not compressed." He then

14

continued, "no you can't ... no it's still ... it's just floating ...it's not compressed. It's got

to be compressed. If we had an insert to where we can push to compress the powder." The

following conversation continued:

> **LITTERAL:** "it would be good for trip but like I was telling him with the pipe bombs
>
> I'm making we need a fuse we need a fuse because these things if we put one here we're
>
> gone."
>
> **CAMPBELL:** "yeah yeah we need to take them out in the woods and test them"
>
> **LITTERAL:** "I'm only making three of them this time around. Then I wanna get get my
>
> buddy to hook me up so we have a practice round."
>
> **CAMPBELL:** "hell yeah"
>
> **LITTERAL:** "things are coming around. This denial of my rifle got me really upset"

## PROBABLE CAUSE FOR SEARCH WARRANTS

27. CAMPBELL has stated to CHS #1 that he has constructed a grenade and that it is currently

stored in a safe at his residence. He indicated that it currently has powder inside of it and that

he only needs to put the primer in. CAMPBELL purchased the primer which he advised was

the final component. He also indicated to the CHS #1 that the tap and die tool for threading is

currently at his tattoo shop. Based on the above, your Affiant asserts there is probable cause

to search the Campbells' residence and Capone's Tattoo Parlor and seize the items listed in

Attachment B hereto.

28. As described above, CAMPBELL uses his cellphone to communicate with LITTERAL as

described herein. Therefore, CAMPBELL's mobile telephone was used as an instrument in

furtherance of his criminal activity. Based on the above, your Affiant asserts there is

15

probable cause to search for Campbell's cellphones to specifically conduct a search of their contents for the items listed in Attachment B.

29. As noted above, LITTERAL has described the manufacture of various types of improvised and homemade bombs. Recently, CAMPBELL told CHS #1 that he and LITTERAL will be manufacturing smoke grenades and smoke bombs using cardboard paper towel roll centers and sugar. CAMPBELL stated that LITTERAL and he will be designing these devices based on videos they have seen on You Tube. Videos, including You Tube, can be watched on a wide range of electronic devices including but not limited to; desk top computers, portable computers, tablets, iPads, video game consoles with on-line capabilities, and/or cellular phones. In addition, LITTERAL and CAMPBELL have told CHS#1 about their interest in Jade Helm and other government activities that they find threatening. Affiant is aware that anti-government extremists use electronic devices to communicate. Moreover, LITTERAL has stated that he and CAMPBELL own or have access to land they plan to use to mount anti-government offensives. Electronic devices are also used to map land use and for directions. Land ownership requires documentation and financing that are often maintained on electronic devices. Based on the above, your Affiant asserts there is probable cause to search electronic devices found in the Campbells' residence, Capone's Tattoo Parlor and Campbell's cellphone to specifically conduct a search of their contents for the items listed in Attachment B.

## REQUEST TO SEARCH, SEIZE AND EXAMINE COMPUTERS AND PERSONAL DATA DEVICES (INCLUDING "SMART PHONES")

30. As noted above, the FBI's investigation has determined that mobile telephones and computers are being used as an instrumentality in the course of, and in furtherance of, the offenses

16

described above.  Based on training, experience, and research, your Affiant knows that iPhones and other mobile devices have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA.  Your Affiant's training and experience has shown that examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, where the device was used, travel information and even banking and finance information, especially while the owner is traveling.

## Technical Terms:

31.  Based on your Affiant's training and experience and consultation with FBI computer forensic analysts, the following technical terms convey the following meanings that are incorporated into this Affidavit and Attachment B hereto:

    a.  **Wireless telephone**:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments,

and other information on personal calendars; and accessing and downloading

information from the Internet.  Wireless telephones may also include global

positioning system ("GPS") technology for determining the location of the device.

b.  **Digital camera**:  A digital camera is a camera that records pictures as digital

picture files, rather than by using photographic film.  Digital cameras use a variety

of fixed and removable storage media to store their recorded images.  Images can

usually be retrieved by connecting the camera to a computer or by connecting the

removable storage medium to a separate reader.  Removable storage media

include various types of flash memory cards or miniature hard drives.  Most digital

cameras also include a screen for viewing the stored images.  This storage media

can contain any digital data, including data unrelated to photographs or videos.

c.  **Portable media player**:  A portable media player (or "MP3 Player" or iPod) is a

handheld digital storage device designed primarily to store and play audio, video,

or photographic files.  However, a portable media player can also store other

digital data.  Some portable media players can use removable storage media.

Removable storage media include various types of flash memory cards or miniature

hard drives.  This removable storage media can also store any digital data.

Depending on the model, a portable media player may have the ability to store very

large amounts of electronic data and may offer additional features such as a

calendar, contact list, clock, or games.

d.  ~~**GPS**:~~  ~~A GPS navigation device uses the Global Positioning System to display its~~

current location.  It often contains records of the locations where it has been.

18

Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. **PDA:** A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and

19

presentations. PDAs may also include global positioning system ("GPS")

technology for determining the location of the device.

f. **iPad or Tablet**: An iPad is Apple's brand of a tablet. A tablet is a mobile

computer, typically larger than a phone yet smaller than a notebook that is

primarily operated by touching the screen. Tablets function as wireless

communication devices and can be used to access the Internet through cellular

networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain

programs called applications or "apps," which, like programs on a personal

computer, perform different functions and save data associated with those

functions. Apps can, for example, permit accessing the Web, sending and

receiving e-mail, and participating in Internet social networks.

g. **Computer hardware** is used to save copies of files and communications, while

printers are used to make paper copies of same. Programs loaded on the drives are

the means by which the computer can send, print and save those files and

communications. Finally, password and security devices are often used to restrict

access to or hide computer software, documentation or data. Each of these parts of

the computer is thus integrated into the entire operation of a computer. In order to

best evaluate the evidence, the computers—and all of the related computer

equipment described above—should be available to a computer

investigator/analyst.

h. **IP Address**: An Internet Protocol address (or simply "IP address") is a unique

numeric address used by computers on the Internet. An IP address is a series of

20

four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

i. **Internet**: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

**Electronic Storage and Forensic Analysis:**

32. Based on knowledge, training, and experience, your Affiant also knows that electronic devices including cellphones, tablets, computers and thumb drives can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on an electronic device. This information can sometimes be recovered with forensic tools.

   a. **Forensic evidence**. As further described in Attachment B, the Applications for Search Warrants seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how a device was used, the

21

purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on a device because:

b.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

c.  Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

d.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

e.  The process of identifying the exact electronically stored information on storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

22

f.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

g.  **Nature of examination**.  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrants your Affiant is applying for would permit the examination of devices consistent with the warrants.  Such an examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

33.  **Seizure of Computer Records, including Passwords and Encryption Codes**:  Your Affiant seeks to search for and seize any and all software, hardware, instructions, security codes, passwords and/or hardware which may be used to encrypt (secure) the computerized information.  Such records include off site computer records accessible from the search location, magnetic mediums for storage and retrieval (like hard disks, diskettes, tapes, laser disks, Bernoulli drives, USB "thumb" drives, CDs, DVDs, external hard drives, cellular telephones, SIM cards) and all associated documentation describing the programs utilized for magnetic storage, as well as all computer equipment utilized to access, use and examine the computer stored records used for the aforementioned related documentation, including; desktop computers, portable computers, monitors, keyboards, printers, external disk drives and tape backup devices.

23

34. **Manner of execution**.   Regarding the computer search described above, it is the Affiant's intention to execute the requested warrants as follows:

    a.   Constructively seize immovable computer equipment so that an expert can run the computer's program and generate a written format and/or electric or magnetic format duplicate, or secure the back-up copy all the records therein to determine if they are specified in the search warrant.   The FBI requests authorization to remain on the premises until this is accomplished.

    b.   Physically seize mobile telephones, iPads, tablets, PDAs and movable computer equipment (laptop computers, desk top computers, personal computers, monitors, keyboards, disk drives, printers and power supplies) disks, diskettes, tapes, modems, operating systems, manuals and software.   This equipment and storage media will be analyzed and records and information as described in this warrant will be duplicated and/or printed in a written format.

    c.   As with any search warrant, your Affiant expects that the warrants requested herein will be executed reasonably.   Reasonable execution will likely involve conducting an investigation on the scene of what computers, or storage media must be seized or copied, and what computers or storage media need not be seized or copied.   Where appropriate, officers will copy data, rather than physically seize computers, to reduce the extent of disruption.   If, after inspecting the computers, it is determined that some or all of this equipment is no longer necessary to retrieve and preserve the evidence, the Government will return it.

24

34. **Manner of execution**.   Regarding the computer search described above, it is the Affiant's intention to execute the requested warrants as follows:

    a.  Constructively seize immovable computer equipment so that an expert can run the computer's program and generate a written format and/or electric or magnetic format duplicate, or secure the back-up copy all the records therein to determine if they are specified in the search warrant.   The FBI requests authorization to remain on the premises until this is accomplished.

    b.  Physically seize mobile telephones, iPads, tablets, PDAs and movable computer equipment (laptop computers, desk top computers, personal computers, monitors, keyboards, disk drives, printers and power supplies) disks, diskettes, tapes, modems, operating systems, manuals and software.   This equipment and storage media will be analyzed and records and information as described in this warrant will be duplicated and/or printed in a written format.

    c.  As with any search warrant, your Affiant expects that the warrants requested herein will be executed reasonably.   Reasonable execution will likely involve conducting an investigation on the scene of what computers, or storage media must be seized or copied, and what computers or storage media need not be seized or copied.   Where appropriate, officers will copy data, rather than physically seize computers, to reduce the extent of disruption.   If, after inspecting the computers, it is determined that some or all of this equipment is no longer necessary to retrieve and preserve the evidence, the Government will return it.

24

## REQUEST FOR SEARCH WARRANTS

35. Based on all of the facts and your Affiant's impressions and assertions detailed above, your Affiant respectfully submits that there is probable cause to search the premises enumerated above for fruits and instrumentalities of the crimes described herein. A separate list of items to be searched for, seized and examined from each location is attached and incorporated by reference herein as Attachment B.

FURTHER AFFIANT SAYETH NOT

Sworn and subscribed this 30th day of July, 2015 in Charlotte, North Carolina,

_____
Mark S. Kozen
Special Agent/Task Force Officer, FBI JTTF

Subscribed and sworn in my presence on this, the 30th day of July, 2015.

_____
David C. Keesler
United States Magistrate Judge

25