IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

```
_____
                                )
UNITED STATES OF AMERICA,        )
                                )
                                )   DOCKET NO. 3:15-CR-223
            vs.                  )
                                )
CHRISTOPHER TODD CAMPBELL,        )
                                )
            Defendant.           )
_____ )
```

TRANSCRIPT OF SENTENCING HEARING
BEFORE THE HONORABLE FRANK D. WHITNEY
UNITED STATES CHIEF DISTRICT COURT JUDGE
WEDNESDAY, JANUARY 20, 2016 AT 9:30 A.M.

<u>APPEARANCES</u>:

On Behalf of the Government:

     MICHAEL E. SAVAGE, ASSISTANT U.S. ATTORNEY
     U.S. Attorney's Office
     227 W. Trade Street, Suite 1650
     Charlotte, North Carolina  28202

On Behalf of the Defendant:

     JOSEPH L. LEDFORD, ESQ.
     Joseph L. Ledford, Attorney at Law
     912 Cameron Brown Building
     301 South McDowell Street

             JILLIAN M. TURNER, RMR, CRR, CLR
                Official Court Reporter
             United States District Court
              Charlotte, North Carolina

1    (Wednesday, January 20, 2016 at 9:30 a.m.)

2                    P R O C E E D I N G S

3        (Counsel and defendant present.)

4            THE COURT:  Good morning.

5            THE COURTROOM AUDIENCE:  Good morning, Your Honor.

6            THE COURT:  I want to thank counsel for allowing us

7    to start this hearing a little early.  Our prior hearing had

8    a little snafu, and so we were not able to have that hearing.

9            We're now here in United States v. Christopher Todd

10   Campbell.  Mr. Ledford is here on behalf of Mr. Campbell, and

11   Mr. Savage is here on behalf of the United States.

12           Mr. Ledford, I haven't had you in my courtroom in a

13   long time.

14           MR. LEDFORD:  It's been a while, Your Honor.  I've

15   been with Judge Conrad.  It's an absolute delight to be back

16   on the first floor.

17           THE COURT:  Thank you for coming back here.

18           Mr. Savage, of course, you were here yesterday.

19   Welcome back.

20           Mr. Campbell, if you could stand again.

21           Do you recall appearing before Magistrate Judge

22   David Keesler on September 21st of last year for the purpose

23   of entering two pleas of guilty?

24           THE DEFENDANT:  Yes, Your Honor.

25           THE COURT:  And do you remember being put under

1    oath at that time?

2              THE DEFENDANT:  Yes, Your Honor.

3              THE COURT:  And do you remember answering a series

4    of questions of Judge Keesler?

5              THE DEFENDANT:  Yes, Your Honor.

6              THE COURT:  Were all your answers to all of his

7    questions true and correct?

8              THE DEFENDANT:  Yes, Your Honor.

9              THE COURT:  If I were to ask you those same

10   questions again today, would your answers be the same?

11             THE DEFENDANT:  Yes, Your Honor.

12             THE COURT:  On that day you were asked to review an

13   electronic document known as Acceptance of Plea Form.  That

14   document lists all the questions that the Court asked you

15   during the course of that hearing.  As you answered each

16   question, the judge checks off your answer.  At the end of

17   the hearing you're asked to review the document to make sure

18   that the magistrate judge did correctly fill it out, and you

19   were asked to sign the document.

20             Did you review the document for accuracy and did

21   you sign it?

22             THE DEFENDANT:  Yes, Your Honor.

23             THE COURT:  All right.  Thank you very much, sir.

24             Now, Mr. Ledford, were you present at that Rule 11

25   hearing?

1          MR. LEDFORD:  I was, Your Honor.

2          THE COURT:  Do you believe Mr. Campbell fully

3    understood Judge Keesler's questions?

4          MR. LEDFORD:  I do, sir.

5          THE COURT:  Thank you.

6          Mr. Campbell, one last question, and it's the most

7    important question I'll ask you during the course of this

8    hearing.  On September 21st of this year, you admitted to

9    Judge David Keesler that you were guilty of two federal

10   felonies.  The first of those was possession of an

11   unregistered firearm in violation of Title 26, United States

12   Code, Sections 586 -- excuse me, 5861 and 5871.  You also

13   admitted to Judge Keesler that you were guilty of the federal

14   felony of making a firearm in violation of the Natural

15   Firearms Act in violation of Title 26, U.S. Code, Sections

16   5861(f) and 5871.

17         Now, I ask you again this morning are you in fact

18   guilty of those two federal felonies?

19         THE DEFENDANT:  Yes, Your Honor.

20         THE COURT:  Thank you, sir.

21         Based upon those representations and the answers

22   given by the defendant at the Rule 11 hearing before

23   Judge Keesler, the Court affirms the magistrate judge's

24   findings that the defendant's pleas were knowingly and

25   voluntarily made, and that the defendant fully understood the

1   charges, the potential penalties, and consequences of his two

2   pleas of guilty.  Accordingly, the Court affirms the

3   magistrate judge's acceptance of the defendant's pleas of

4   guilty at the Rule 11 hearing.

5           Now, independent of the magistrate judge, this

6   Court has reviewed the record in this case, including the

7   Rule 11 colloquy.  And based on the Rule 11 colloquy and the

8   answers given by the defendant today, the Court also finds

9   that defendant's -- I should say this Court also finds that

10  defendant's plea was knowingly and voluntarily made, and the

11  defendant fully understood the charges, the potential

12  penalties, and consequences of his pleas.  Accordingly, this

13  Court accepts the defendant's two pleas of guilty at the

14  Rule 11 hearing and adjudicates the defendant guilty of the

15  felonies of possession of an unregistered firearm and making

16  a firearm in violation of the Natural Firearms Act.

17          Now, Mr. Campbell, after you entered your two pleas

18  of guilty, your case was referred to the United States

19  Probation Office for what's referred to as a presentence

20  investigation report.

21          Oh, excuse me.  Before I jump to that, I want to

22  note that you did enter into a written factual basis with the

23  United States.  That written factual basis was incorporated

24  in the offense conduct section of the presentence report.

25  That written factual basis is Document No. 18 in the

1    Electronic Case File.

2         Based on that written factual basis and the

3    admissions you made to the magistrate judge, the magistrate

4    judge did find there was a factual basis for the entry of the

5    two pleas.  This Court affirms that finding and, likewise,

6    this Court independently finds there is a factual basis based

7    on the written factual basis and the admissions by the

8    defendant.

9         Now, back to the presentence investigation report.

10   After you entered your two pleas of guilty, your case was

11   referred to the United States Probation Office for

12   preparation of this report.

13        Have you received a copy of this report?

14        THE DEFENDANT:  Yes, Your Honor.

15        THE COURT:  Have you read it?

16        THE DEFENDANT:  Yes, Your Honor.

17        THE COURT:  Do you understand it?

18        THE DEFENDANT:  Yes, Your Honor.

19        THE COURT:  Have you had an opportunity to go over

20   the report with Mr. Ledford?

21        THE DEFENDANT:  Yes, Your Honor.

22        THE COURT:  And has Mr. Ledford answered any and

23   all questions you have regarding this report?

24        THE DEFENDANT:  Outstanding, Your Honor.

25        THE COURT:  All right.  Thank you.

1          Now, Mr. Ledford, I do not believe there are any

2   outstanding objections; is that correct?

3          MR. LEDFORD:  There are no objections, Your Honor.

4          THE COURT:  Thank you.  Then the Court will adopt

5   the information contained in the presentence report for

6   purposes of calculating the advisory guidelines, and this is

7   before consideration of any motion filed by the United

8   States.

9          In the instant case, the guidelines provide for an

10  offense level of 17, a criminal history category II, for a

11  guideline range of 27 to 33 months.

12         Do the parties agree those are the appropriate

13  advisory guidelines before considering any substantial

14  assistance motion?

15         MR. LEDFORD:  They are, Your Honor.

16         MR. SAVAGE:  Yes, Your Honor.

17         THE COURT:  Thank you.

18         Now, the United States has filed a motion under

19  seal.  The Court has reviewed that motion.  The Court

20  believes it does meet the standards of substantial

21  assistance.  The Court will grant the motion, and the

22  Government may elaborate if it likes, but the Court will

23  reserve ruling on the extent of the departure until it's

24  heard from both counsel.

25         Mr. Savage, anything you want to add?

1    MR. SAVAGE:  No, Your Honor.  I think the motion
2  speaks for itself.
3    THE COURT:  Okay.  Thank you.
4    Mr. Ledford, I'll hear from you on behalf of
5  Mr. Campbell.
6    MR. LEDFORD:  Your Honor, when I first found out
7  about this case when I was sitting at home and all of sudden
8  there's this flash about on the media about a situation in
9  Belmont where a place is being raided, and I hate to say
10  this, but I sat there and said, Well, I'm glad I'm not
11  representing those guys.  I'm not going to lie to him.
12  Because I think that the way things are presented creates
13  impressions in our mind, and I -- and I'm guilty of that.
14  And I'm going to talk in a moment about how I think he is
15  also been guilty of having been influenced by what I
16  sometimes consider to be the irresponsible exercise of what I
17  consider to be the most important right; and that is, our
18  First Amendment rights.
19    As fate would have it, I had to speak to a fellow
20  -- I'm a national commissioner with youth baseball
21  association.  We're the sixth largest in the country, and I'm
22  a national director in Texas.  And I speak with him, he said,
23  You-all got these terrorists up in North Carolina.  So the
24  guy, and he started talking -- making fun of North Carolina.
25  I kind of felt like being accused of being anti-government by

1    a guy from Texas, which is kind of like being called ugly by

2    a frog.

3         But that was my impression of Mr. Campbell.  My

4    impression of Mr. Campbell was that they were a bunch of

5    dangerous men, dangerous to their community and dangerous to

6    their country.  And in all frankness, I didn't want the case.

7    I allowed myself to be influenced by what other people had to

8    say about another person, and I plead guilty to that.  I try

9    not to be that person, and I try not to be that lawyer.

10         I then got a call from a woman named

11   Ms. Allison Richmond, who is with us in court today, his

12   significant other.  And if there was ever a "stand by your

13   man kind of woman," there she sits, Your Honor.  And she

14   asked me about the case, and I told her that I would talk to

15   him and I would make a decision.  And I was kind of dreading

16   meeting Sergeant Campbell because, to be honest with you, I

17   didn't know what to expect when I went over to the jail to

18   see him.  I was expecting to meet someone who was

19   belligerent, who had nothing good to say, who was an angry

20   man, and I was a little bit afraid of what I might encounter.

21         I will tell the Court this is my 34th year.  I'm

22   starting to think that I'm getting a little old for criminal

23   defense.  You know, especially when I look around the

24   courtroom and everybody is about half my age.

25         But I didn't know what to expect.  And I went in

and met this guy.  And I will tell you I think I've seen him
nine, ten times.  And, frankly, I look forward to seeing him.
In all the years that I have been going to the jail, I have
never had an individual when I walk in the room stand.  He
stood.  I've never had an individual who was so positive
about his situation.  I've never had an individual complained
less about the circumstances that he found himself in.  And
when I asked him, you know, you got a pretty good attitude
about all this and he looked at me, Sir, at end of the day,
I'm a marine.

          And I want to tell you a little bit about this
marine.  The first thing that we talked about was a belief
that I -- it is my genuine belief that he was satisfied that
at some point we will be fighting the Chinese.  I think that
he -- he talked to me about and actually pointed me to a
website.  Sure enough there's a website out there that lays
claim to a notion that the Chinese and Russians have somehow
come together and built an underground base in Mexico and in
that base there are 10,000 armored vehicles.  Now, he told me
it was his belief that the amount of debt that we owed to
China, if China's economy ever got in trouble, they would
come and lay claim to the oil in the Central United States of
America, and he told me he was getting ready for that event.

          Now, Your Honor, while I shared his belief that
ultimately we will have some engagement with the Chinese.  I

1  just believe that's going to happen.  I hope not.  I,

2  frankly, think the fight will be over Australia, but --

3         He was convinced, and I think having -- the

4  internet provides a lot of outlets for people to be angry and

5  say things about their government and to talk about threats

6  to this nation, and I think some people take those threats --

7  I think some people don't take them serious enough, and I

8  think some people take them way too seriously.  It is my

9  genuine belief that he was very sincere in his core belief

10  that the United States would be invaded and that he was going

11  to be ready to protect his family and to protect his country.

12  I do believe that with that state of mind, the people that he

13  was around, I think he was easily led into shall we say the

14  graduation of that belief into something more serious.

15         And you know, Your Honor, one thing that I have

16  come to learn is that where people have their demons, whether

17  those demons really exist or not, they exist in that person's

18  mind.  They are serious enough.

19         I did not file some documents that I want you to

20  take a look at, and I'll tell you why:  Because there was a

21  lot of media attention in this case when it first began.  I

22  haven't seen anybody since then.  Your Honor, some of the

23  documents include the names of other people and including

24  some military individuals.  And so I -- I decided not to make

25  those where the media would have access to them because,

1  frankly, I don't trust folks not asking people questions.

2         Shortly after he was charged, his wife put up a

3  website Witness of Good Character for Christopher Campbell,

4  and there were 305 people that signed on that petition.  They

5  also posted some comments at the back as to what they thought

6  of Mr. Campbell.

7         Your Honor, I do not believe that I could find 15

8  people to bear witness to my good character, and I don't know

9  anyone who would say anything positive about me, except

10 perhaps some of the kids that play ball for me.

11        Would you mind?

12        MR. SAVAGE:  No.  Go ahead.

13        MR. LEDFORD:  Your Honor, I don't expect you to

14 look through those, but I offer them as illustrative as to

15 how he is perceived in this community by folks and friends.

16        In addition --

17        THE COURT:  Give me a moment.

18        MR. LEDFORD:  Certainly.

19        THE COURT:  It's a lot to consume at once, but I do

20 want to read through the whole document.  Just give me a

21 couple moments.

22        (Pause.)

23        THE COURT:  All right.  I've gone through all the

24 witnesses of good character and also read some of the

25 comments attached.

1          MR. LEDFORD:  Your Honor, could I approach with

2     some of his accommodations for the Court?

3          THE COURT:  Certainly.  All right.  I've been

4     through his awards and certificates.

5          MR. LEDFORD:  The last thing I'd like the Court to

6     consider in terms of documents, and I'd like to read this

7     into the record.  While he's been in custody, I didn't have

8     to encourage him.  He started enrolling in classes out there.

9     He has some young children and took some classes that would

10    help him be a better parent.  One in particular is Life

11    Connections, Inc., which he completed October 23, 2011.  He

12    has that certificate.  Strengthening Parenting.  He also

13    completed the Q Foundation Life Skills in December of 2015.

14    The Q Foundation Fatherhood also completed in December 2015.

15    And Anger Management, which he said he had an issue with and

16    he wanted to take a course that would help him deal with

17    that.

18         Your Honor, can I tender those for review for you

19    to take a look at?

20         THE COURT:  Please.

21         MR. LEDFORD:  He's also enrolled in some courses

22    he's yet to complete, but he's in the process of completing

23    those as we speak.

24         THE COURT:  Okay.  Thank you.  I've reviewed those

25    also.

1       MR. LEDFORD:  Your Honor, when I talk to this man,

2   he was a marine and his heart will always be a marine.

3       THE COURT:  I believe once you've finished

4   boot camp, you're always a marine, right?  It's not was a

5   marine.  It's always a marine.

6       MR. LEDFORD:  Your Honor, I go out of my way to try

7   to defend members of our law enforcement community, soldiers.

8   I honestly think that how we treat veterans in this country

9   is consistent with how other nations throughout world history

10  have treated our veterans.  I'm not a veteran, and I respect

11  more than they will ever know the men and women who have the

12  courage to put on the uniform of this country and to say no

13  matter who the commander or chief is, where you send me I

14  will go.  They do a job that, frankly, I'm glad I don't have

15  to.  And there are a lot of veterans in this room.  I cannot

16  express -- including Your Honor.  I cannot say how a grateful

17  nation simply does not do enough for all of you all.  And I

18  -- I've actually thought about running for Congress on that

19  platform, but who would vote for me?

20      MR. SAVAGE:  But, Your Honor, Mr. Campbell has

21  faced his hard times.  He has very young children.  And, you

22  know, as your children grow older, there are moments in time

23  that you simply can't recreate.  One of those happens to be

24  Christmas, one of the most sacred times of the year for

25  Christian folks.  And he missed that with his children this

1   year.  There's no recreating that.  And yet he did so, as I

2   would expect from a marine, as I would expect from a man who

3   I consider to be a man of honor and a man who I'm embarrassed

4   to say based upon media reports I prejudged.

5        I do believe that he, if you actually listened to

6   the hours of conversation, the lure is being cast, and I

7   think at that point in his life he simply wasn't strong

8   enough to resist that lure.

9        I will tell the Court there's no doubt in my mind

10  that he poses a greater threat to the Chinese and to the

11  enemies of his family and his country than -- than to any of

12  us.  I'm proud to be his lawyer, and I'm proud to be with him

13  today.

14       I told him when we first got started that this

15  might take well over a year to get concluded, and I thank the

16  Court for the rapidness at least your office is handling

17  criminal cases, and I thank you for that.

18       So this comes closer to its conclusion.  He's asked

19  to be heard for allocation.  I'd tender him, and I would like

20  to make one closing remark.  Your Honor, he has prepared a

21  written statement.  And if he can't get through it, I would

22  ask the Court to allow me to finish it for him.

23            THE COURT:  Certainly.

24            MR. LEDFORD:  Good morning, Your Honor.  And thank

25  you for your time.  I would like to start out by clearing the

air on my outward appearance.  I'm sure you're fully aware
the business I own and my employment in the tattoo industry.
As a result, I've acquired quite a collection of skin art
being involved in the field of business for 15 plus years.

Being a marine, I also feel obligated to explain my
hair to a senior service member so it's perfectly clear that
the lack of a haircut is not due to a lack of respect.  I
maintained a high and tight until the day I found out my son
was conceived based off of some Bible scriptures I have read
about Nazirite Samson in the *Book of Judges*.  After his
mother's inception, the Lord said to her, No razor shall come
upon his head because as long as Samson had his seven locks,
you all will grant super human strength.  So to remind me of
the strength I wanted the Lord to grant me in order to be the
best father I possibly could, I have not cut my hair since
the beginning of my fatherhood.

Now that I have explained my outward appearance, I
would like to tell you about my inward composite.  I come
from a long line of service members.  Both of my grandfathers
were at Normandy on D-Day.  Both were members in the United
States Army.  One was a basic infantry; the other was 101st
Airborne, golden globe boxer, Purple Heart recipient, and a
German camp POW for almost a full year.  My father did two
tours in Vietnam with the United States Army as well.  His
first tour was as an aviation mechanic, his second was as an

1  MP.

2       With such prestigious patriots in my family tree

3  and the blood in my veins, it was only natural to me to do my

4  part to support a great nation after the vicious attacks of

5  9/11.  As a result, I enlisted in the United States Marine

6  Corps in 2003 at the age of 18 to defend the freedoms of this

7  country as my father and grandfathers have done before me.

8       After reporting to Parris Island for basic

9  training, through some hard work and dedication, I received

10  one of three available meritorious promotions to E-2 private

11  first class before heading to Camp Le June for School of

12  Infantry.

13       After my SOI, I was sent to my MOS training for

14  test measurement diagnostic equipment technician on Keesler

15  Air Force Base in Bilouxi, Mississippi, for eight months.

16  After graduation I received orders to 3rd Marines Combat

17  Service Support Group 3, Kaneohe Bay, Hawaii.

18       Having an MOS that was rarely deployed, I requested

19  for an additional MOS as a Marine Corps martial arts

20  instructor in order to teach my -- in order to teach young

21  marines the hand-to-hand combating skills and how to cope

22  with the physical and mental defeat in combat before they

23  headed overseas.  If I could not directly help my brothers

24  and arms on the front line, I felt the next best thing would

25  be to provide the best training I and the Marine Corps had to

1  offer to ensure their safe return.

2          In the years to come, I managed to make it to

3  sergeant or E-5 before my honorable discharge in 2009.  Along

4  with the awards you have already seen, I also received a

5  global war on terrorism, a national defense, and a good

6  conduct medal.

7          I highly enjoyed every aspect of my service with

8  the Marine Corps.  I'm grateful for the outstanding people I

9  met, the discipline I was taught, and the great memories and

10  stories that came with it all.  Most of all, I am thankful

11  for being given the opportunity to defend the red, white and

12  blue, as my father and grandfathers had done so many years

13  before me.

14          Before entering the marine Corps, I managed to save

15  up $15,000 to start up costs for my first business by working

16  as a tattoo artist in addition to the Corps often resulting

17  in 20-hour days.  After being in a successful operation for

18  approximately four years, I received my approval for my

19  30 percent disability due to my degenerative disc syndrome I

20  acquired from my service.  After receiving the $10,000 in

21  backpay for the four-year delay, I invested it all back into

22  my business in order to improve the building and location

23  where I operate from today.

24          It only took a few years away from the Corps until

25  I found myself longing for a sense of camaraderie and ability

1   to help my fellow Americans.  I found fulfillment for both

2   AFA and Watch 462 in Cramerton.  In addition to the charity

3   we do with the Oxford Home Burn Hospital and local families

4   in distress, I also enjoyed doing independent charity as

5   well, some of which includes volunteering at local schools

6   for job fairs, explaining ways to become an entrepreneur that

7   does not require college education.  Donating time and funds

8   to the Sons of Soldiers was a group of motorcyclists that

9   raise money to support and honor our vets and the veterans of

10   our country in many different ways.

11        I also try to keep my eyes and ears open to help

12   anyone in my church or community that may have lost their job

13   and need clothes and supplies for their kids or whose homes

14   were lost due to a fire and need monetary support and

15   clothing, both of which are examples of opportunity I've been

16   given to help.

17        After experiencing the joy of working with other

18   families and kids, I found myself longing for a family of my

19   own.  The Lord heard my prayers because he sent me the

20   strongest, sweetest, most loving, compassionate, supportive,

21   and truly beautiful on the inside and out, God fearing woman

22   by the name of Allison Richmond to be my financée and to give

23   me the two most beautiful children I've ever laid eyes on, my

24   two-year-old son, Wyatt Watts Campbell; and my one-year-old

25   daughter, Parsky Camille Campbell.  These three individuals

taught me the true definition of love.  Allison and I growing up in broken homes only made our appreciation and love for our family's unity that more important to cherish.  They are truly the center of my universe.

Allison has done an amazing job in supporting our family and maintaining the business despite my absence and numerous obstacles that have appeared during these trying times.  I'd like to take a moment to say thank you and I love you.

I would like to make it perfectly clear that my only desire above all else is to return to my family to help provide and heal emotional and psychological damage -- excuse me.  To help provide and heal emotional and psychological damage that I've unintentionally inflicted on my financée and children through my -- the absence caused by my poor decisions that I've made in the preceding months.

With all this being said, I would like to explain the information and thoughts that led to my poor decision that I made.  Being a marine, I try to keep up with global views, news and events to keep me informed on what my fellow Marines are dealing with who chose to continue their careers after I EDS'd.

After scrolling through some articles, I came across a title "China Builds Military Harbor in South China Sea."  After further research, I found that China had

fortunately taken over the South China Sea, which is in UN waters. Many countries such as the Philippines, Vietnam, and others relied on these waters to provide food and money via their fishing boats. Not only that, the South China Sea is also a main passage for United States and other countries' main transportation.

China was uncooperative with the UN's attention to question their motives and rights to take over the body of water. Most of all, when America was sent drones over the construction site, China responded with threats along the line of, Get out of our airway or we will shoot.

Showing obvious signs of aggression, this along with China's economy in the state of decline and America's discovery of oil in the center of our country due to the creation of horizontal tracking set the scenes for concern. Supported by China's willingness to sign the Trans-Pacific Post Act, also known as TPP, which from what I understand comes a multitude of topics. One of which being trade agreements with the rest of the UN and to all on board concerning the newly accessible oil in America, which calculated properly would make America one of the world's top exporters of oil.

This, along with the fact that America is over $20 million in debt to China and the obvious signs of aggression and uncooperation raised even more concern in my

heart.  Even more when you consider we are talking about the country that literally wrote the book *The Hard War,* which prizes itself on the theory of its element of surprise. Saying something along the lines of the easiest opponent to defeat is one that's unaware they're in a battle.

To even consider the thought of an invasion on American soil by the largest country in the world with a ratio of five to one population count was devastating.  I was reminded of a quote, "America will not understand the true definition of war until blood is shed on their own soil."  If that is the case, I hope America, my friends, my family, my financée, and most all of my children never have to understand war's true definition.

When all these elements came together to create the big picture I was viewing, it gave me an overwhelming sense for the need to be proactive.  Perhaps it was caused by coming from a military family or by being a marine, or for the love of my country, or for the love of my fianceé, or simply the instincts of a young father wanting to protect his kids.  All I knew was I was going to try to prepare to defend my country and family and pray to God it would never come to that.  That if I've seen the signs and done nothing and God forbid it happen and having to live with the guilt of doing nothing.  So I went into things too much.  I shouldn't have got so worried.  I was thinking too much like a marine and a

worried father and became overzealous in my pursuit for the
ability to protect and defend my family and country. All
these things I'm guilty of. But I want to make one thing
perfectly clear, sir. During all of this, never once did a
malicious thought or intent ever cross my mind or heart
toward a fellow American at any time.

I would also like to say that I have a full
understanding of the unlawful actions I took, and I would
like to express my full remorse not just for the laws broken,
but also for the consumption of yours and the ATF and the
JCTS's time and effort. Not to mention that I used some
American tax dollars all due to my irresponsible
decision-making. I'm truly sorry.

I definitely learned I should have spent more time
cherishing every moment I had with my children and focusing
on them instead of global events I'm sure our country has
under full control. That, I'm also sorry.

With all this being said, I hoped to have made it
perfectly clear that I had good initiative, just bad
judgment. I would also like to ask for your mercy so I can
return to my father to be the father, husband, and community
member the Lord intended.

Thank you for your time, Your Honor, and God bless.

THE COURT: Thank you very much, Mr. Campbell.

MR. LEDFORD: Your Honor, I would say he is a

little bit more of an Old Testament guy than I am, but I have found that most marines tend to be more Old Testament guys than I tend to be.

But I will say to the Court is there are cases if you look at the purposes of sentencing, the goals of sentencing and the ideas and concepts of justice, which is all wrapped into that, there are cases where definitive strong signals need to be sent. There are cases -- and I hate to say this -- where sometimes examples need to be made. There are times that in order to deter other type of conduct the Court has to speak loudly with a serious voice.

And I -- I respect and appreciate the fact that now where more and more people are feeling that's appropriate to occupy the federal land and engage in confrontations with authorities at the local, state, or even the federal government. I fully appreciate that there are times and places where not only is it necessary, but I expect my government to stand up and say, Not today.

But, Your Honor, I do not believe that this is that case. I do not believe that this is that time. I -- I genuinely believe that a good, good man let his fears -- sometimes you can have too much knowledge shall we say. And when you have other individuals who were older who probably have a little bit more anger, and I don't want to say role model because I think a marine will tell you they don't

really have a role model. They are their own role model.
They're the role model for the rest of us. I do think
sometimes people who would probably benefit from some
counseling and an outlet to talk to outside of the church. I
think it sometimes it's easier for those people to walk down
that path.

Your Honor, I believe that you have in front of you
a very humble, sincere, genuine, good man who I called her
his wife, but his financée has kept his business alive and
has struggled, has moved in with his father, has raised her
children on her own. Your Honor, I'm going to ask you to do
whatever you can do to get this marine back with his family
as soon as you possibly can.

I appreciate the fact that what I asked for and
what he seeks is a substantial greater departure than the
Government might be asking for, but I would tell the Court
there are very few times I've walked into a federal courtroom
and said I believe that is appropriate, because I understand
the system as well as the next guy. But, Your Honor, I do
believe Sergeant Campbell is a good man. I believe he gets
it. I believe with the benefit of some counseling, probably
from someone like United Family Services, will assist him.

The one thing that I do know about military men and
the greatest punishment to a military person is he will never
be allowed to possess a firearm again as long as he lives,

1    and I will tell the Court --

2            THE COURT:  Well, I -- actually, that's not true if

3    he's allowed to reenter the military, but the felony

4    conviction would make it hard for reenlistment.

5            MR. LEDFORD:  Yes.

6            THE COURT:  But other than a misdemeanor crime of

7    domestic violence, you may -- there is an official use

8    exception for use of possessing firearms by felons in both

9    law enforcement and the uniformed services, but the obstacle

10   is going to be reenlisting with a felony conviction.

11           MR. LEDFORD:  And, Your Honor, with the disability

12   he received, that would effectively foreclose that as an

13   option.

14           THE COURT:  Yes.

15           MR. LEDFORD:  I will say this:  If the Chinese do

16   hit our shores --

17           THE COURT:  I think all those would be --

18           MR. LEDFORD:  -- I think he'll be there.

19           THE COURT:  Yeah.  I think if there is a Chinese

20   invasion --

21           MR. LEDFORD:  I will be there.

22           THE COURT:  -- well, there will be constriction and

23   any volunteers would be welcomed regardless of disabilities

24   or a felony, because there have been many times in the U.S.

25   history where disabilities and felonies were waived for

1   reenlistment or unless initial enlistment.

2           MR. LEDFORD:  I would say, Your Honor, the Sixth

3   Army had solid brad [sic] produced the amount of square

4   blocks they were not getting their people to stand in the

5   trench to resist policy, Sixth Army.  A lot of hypothetical

6   debates when the rubber meets the road.  It just don't -- it

7   just don't apply.

8           THE COURT:  Exactly.

9           MR. LEDFORD:  Your Honor, I think I've said enough.

10  I think you have a flavor of what this case is about.  And I

11  told him that he could absolutely trust Your Honor to do what

12  is best in this case for him, his family, and for the United

13  States.

14          Thank you for allowing us to be heard.

15          THE COURT:  Thank you, Mr. Ledford.

16          Mr. Savage.

17          MR. SAVAGE:  Your Honor, I'd be the last person to

18  say this country shouldn't honor its veterans.  For those of

19  us who have served, we understand it's a solemn

20  responsibility and it's an honor to be part of the United

21  States.  But part of the being a veteran is honoring the laws

22  of this country.  So it's not just that we have to protect

23  our veterans.  The veterans have a responsibility to honor

24  the laws of this country and to behave like good citizens and

25  to be respectful not only of the role they played, but of the

1   example they portray. As a marine, he had an exceptional
2   responsibility to act like a marine and to deserve that
3   honor.

4           Your Honor, it seems to me that the defendant's
5   return to civilian life has not been smooth and it was
6   proceeded by several significant events that bring him to a
7   criminal history category II. Indeed, since his discharge in
8   2009, it appears that, at least in 2011, there's a very
9   serious assault. And I can tell you I looked into that
10  assault in which the defendant pummeled a guy in the back of
11  his shop with a set of brass knuckles and did serious harm to
12  this guy. And at that point in time, I wonder if he stood
13  before a judge and said, I'm an honorable marine. I beat the
14  shit out of this guy for whatever reason it was, but it
15  happened. I -- excuse my --

16          THE COURT: I was about to say.

17          MR. SAVAGE: -- my language, Your Honor.

18          THE COURT: Right.

19          MR. SAVAGE: In addition to that, I think with
20  lesser violations.

21          I've got to say that, Your Honor, if Your Honor
22  would go back and review the complaint in this matter, I
23  understand that the defendant now is concerned about the
24  Chinese. I've got to say that after listening to hours and
25  hours of intercepted conversations about this, there was not

one mention of the Chinese in all of the defendant's fears. There was a lot of mention about a military exercise in Texas called Jade Helm. As you well know, Jade Helm was special forces, a special forces exercise in which military members -- members of the United States Marines probably participate in -- practice in order to make sure they can defend the country.

It was Mr. Campbell's belief, along with Mr. Litteral's, that Jade Helm was somehow a subterfuge for a takeover of the country and the ability of the current president to declare marshal law. In an obvious ironic twist, the thing was if the president is going to declare marshal law under the guise of Jade Helm, he's going to come and take our guns. So we're going to protect ourselves by making illegal bombs and weapons, which of course, justifies the government to come take their guns.

I've got to say if you think about -- I do appreciate the fact that the defendant believes and is sincere about his love of his family. What I don't understand is this: Is that he talks about unintentionally inflicting harm. As a marine and being trained in the use of weapons and explosives, this is a man who created a bomb out of an inert grenade and kept it -- and I can tell you a very small house -- feet from where his children slept. And in that bomb all that was needed to do was to take the gunpowder

1  that was below it, unscrew the top of it, fill it up, and it
2  was indeed a bomb.  And indeed, if you can see the news clips
3  from when they came to find this stuff, the FBI and the SWAT
4  team were so concerned about it, they took it in the yard and
5  blew it up.  Later, the Government preparing for trial of
6  Mr. Litteral asked the FBI to conduct an experiment.  We have
7  a video in which that very type of weapon was filled with the
8  very type of smokeless gunpowder which can be bought
9  anywhere --
10             THE COURT:  Right.
11             MR. SAVAGE:  -- fill it up, and it created an
12  explosion.
13             THE COURT:  It wasn't --
14             MR. SAVAGE:  That bomb --
15             THE COURT:  It wasn't improper ownership of the
16  various parts.  It was putting all the parts together.
17             MR. SAVAGE:  Yes, Your Honor.
18             THE COURT:  Taking the inert training grenade and
19  turning it into an active --
20             MR. SAVAGE:  Right.  And a great deal of effort
21  went into this.  A great deal of effort.  Because, obviously,
22  if you have a grenade, the grenade is drilled up so it can't
23  hold gunpowder.  Its fuse is disassembled.
24             Mr. Litteral and Mr. Campbell talked extensively
25  about how to recreate this, and he did it.  He's obviously a

very articulate and very smart man. He runs his own business. As he says, he's involved in a lot of activities. But at this time in 2015, what his activities were, were devoted to creating a bomb. A bomb. That he kept in his house with his children.

When the FBI took this device and exploded it in a test field, it would have killed -- it could have killed people within 10 feet and maim anybody within 50 feet. So to say this wasn't dangerous is beyond explanation.

I don't think that the defendant has mentioned that, but I mean, how do you sleep in a house with a bomb and your children? It's just simply more than irresponsible. It's irresponsible. And part I think of it if you want the respect of this country, you want them to respect you because you're a marine and a veteran, then you need to act like you understand that what you do affects others. It's dropping a pebble on a pond. And I don't know how many times we stood in this court, Your Honor, where we find the actions of a defendant ripple out and cascade over the people they love in a way that it's just horrendous.

But indeed, if you are a 30-year-old man, you need to understand that when you violate the laws of the United States and you create a bomb, it is going to hurt people. It's going to hurt people either because it's going to explode or because you're going to get caught doing it and

1    there's going to be a consequence.

2          So, Your Honor, I would say to you this:  This is a

3    marine who's had a very difficult transition to civil life.

4    Some people do it easily; some people do it not.  He's a

5    criminal history category II because he violated the law more

6    than once.  It's a man who deserves, I think, the respect of

7    this country.  He receives a disability payment from this

8    country, and he should repay that by obeying our laws.

9          The Government in this case really appreciates the

10   fact that when I went to talk to Mr. Campbell, he is the

11   believer -- and I agree with Mr. Ledford, a pleasant person

12   to talk to.  The agents say he's a person who is extremely

13   loyal to his friends and fellow marine, Mr. Litteral.  I

14   think maybe to a flaw.  I think that the cooperation in this

15   case could have been better, but it was -- it was sufficient,

16   and I think it deserves at least the two levels we're asking

17   for.

18         And then Your Honor, I think, has to look at the

19   characteristics of the defendant.  In this case, Mr. Barker

20   has a higher criminal history category than say -- I'm sorry.

21   Mr. Campbell has a higher criminal history category than

22   Mr. Barker.  I think his offense was -- you can review it one

23   way.  Is it more dangerous to have a convicted felon who

24   hasn't demonstrated any kind of violence in possession of a

25   weapon, or is it more dangerous to have a trained marine in

possession of a bomb?  And apparently, willing to use it when he thinks it necessary, not when he thinks his country thinks it is necessary.

So you take those two things, you weigh them together, and then you come about to where I think the Government is, is about a level 15, criminal history category II, 21 to 27 months.  Weighing those things out and comparing -- and addressing the ability not to have disparate sentences for different people in this area.  Some people have cooperated; some people have had better; some people more.  I think you come about right at 21 to 27 months.  It's a harsh reality, and I think it's a punishment.  But it should be a punishment and it should be a deterrent for this defendant especially.

I mean, in other cases you say, Well, do I need to worry about deterrence?  I think in this case you need to worry about deterrent effect because there's always going to be guns available.  There's always going to be smokeless gunpowder.  You can walk into a Wal-Mart and buy gunpowder. You can walk into a feed store and buy fertilizer.  You can look on the internet and know how to build a bomb.  There's no way on earth, Your Honor, we can prevent this person from doing this again.  No way on earth.  The only thing you can do is if you do this again, you will hurt not only yourself, but your family.  There is a consequence for this, and this

1   should deter you for making the decisions you've made in the

2   last five years since you've been in the Marine Corps.  But

3   that 20 or 25 can be a whole new story, and this man has a

4   chance to write that.  You can help him write that by

5   imposing a sentence that will put him on the right track.

6           THE COURT:  Let me ask you:  At what point does

7   gunpowder become ammunition such that a convicted felon

8   cannot possess the gunpowder?

9           MR. SAVAGE:  Your Honor, I've asked that question

10  and that's a difficult question.  I think that it becomes

11  ammunition, I think, when you use it to refill other

12  ammunition.  I think that you can use it in -- it's an

13  explosive, but it has to be a firearm.  It has to be

14  considered ammunition.  Ammunition is not necessarily defined

15  in the statute.

16          THE COURT:  See, that's the problem I have.

17          MR. SAVAGE:  Well --

18          THE COURT:  Is ammunition the complete case, the

19  complete shell?  Or does ammunition include the components --

20          MR. SAVAGE:  I don't know the answer.

21          THE COURT:  -- of that?

22          MR. SAVAGE:  I don't know the answer to that, Your

23  Honor.  I would hope that whether it be just smokeless

24  gunpowder or whatever it would be that this defendant would

25  not possess those things again, especially in his house.

1        THE COURT:  Do you know if -- I mean, is smokeless
2   gunpowder -- what -- smokeless gunpowder in and of itself the
3   defendant can possess?
4        MR. SAVAGE:  I don't know the answer.
5        THE COURT:  We don't know.
6        MR. SAVAGE:  I do not know the answer to that.
7        THE COURT:  We just don't know.
8        MR. SAVAGE:  I do know the answer is smokeless
9   gunpowder can be bought anywhere over --
10       THE COURT:  I understand that both smokeless and
11  old black powder you can buy either, like you say, at
12  Wal-Mart or any gun store.
13       MR. SAVAGE:  I think with black powder there are
14  more restrictions because it's more volatile and you have to
15  store it a certain way.  There are misdemeanor violations for
16  how you store it.
17       THE COURT:  Right.  But black powder it cannot be
18  used, though, in a post-1898 weapon.
19       MR. SAVAGE:  Yes.  That would be true.
20       THE COURT:  Because -- and that's the distinction
21  between what's a firearm and what's not a firearm.
22       MR. SAVAGE:  Right.
23       And finally, Your Honor, I want to wrap this up.  I
24  mean, I'm not making light of the defendant's beliefs.  In
25  this country we have the right to believe whatever we want.

I think what took this particular group of people beyond the edge is this idea we're going to make weapons that we know are illegal. There are rules. The reasons for these rules are very simple.

First of all, these are dangerous things that can hurt people. Okay? They're not controllable. When you leave them somewhere -- one of the things they discussed is whether these grenades could be fused by a trip wire, you know. And they talked about things we're doing to have a compound in South Carolina, and when the Government comes we're going to blow them all up. Maybe they're fantasies; maybe they are not. Whatever they are, you cannot take that one step more, which is collecting the pipes, collecting the bombs, and collecting the knowledge and creating the device. This defendant created the device and did so very deliberately and very intentional. So I think he put a lot of people at risk and at harm here, and he did himself too.

For these reasons, Your Honor, we think a 21-month sentence is not too much and it's not enough -- it's enough. It's enough to show that this particular defendant should not violate the law. It respects his marine service. It gives him credit for what he's done, because it's not the most you can do. You can certainly do much more, but it's enough to show that you got to be able to -- you got to obey the laws and make good decisions.

1        You know, maybe it's easy like when you're in the

2   military, and as you know, Your Honor, you don't have to

3   decide what suit you're going to wear in the morning.  A lot

4   of that stuff is decided for you.  I never woke up in the

5   morning and had to wonder whether I wear the blue suit or the

6   blue suit.  It was the blue suit the whole time.  But I did

7   have to make good decisions all the time about when and where

8   and how I was going to conduct myself.  And that was

9   especially even more true and especially more difficult if

10  you're an easily influenced person and you're in the civilian

11  world.  You have to make the decisions if not for yourself,

12  for your family and children.

13        This guy has a lot going for him.  He has a very

14  successful business.  He appears to be very talented.  If I

15  were to get a tattoo, I understand he's the place to go.  So

16  I would hope when he's done with this he would have a good

17  business.  But meanwhile, Your Honor, this Court has a

18  sentence to give, and it has to give it not to just to him

19  but those that would be influenced by this kind of conduct

20  that there's a specific and general deterrent.  You cannot do

21  this kind of thing.

22        Thank you, Your Honor.

23        THE COURT:  Thank you, Mr. Savage.

24        MR. LEDFORD:  May I make one response?

25        THE COURT:  Yes, you may.

1    MR. LEDFORD:  As I recall, the governor of Texas
2  instructed the Texas Rangers to observe the United States
3  military while it was engaging in those things, and I
4  remember it was right before I got involved with him.  And
5  I'll have to admit I was asking myself, Just what in the heck
6  is going on in America to be -- I mean, that's how I made
7  reference to that earlier when I spoke.

8    And, Your Honor, I saw it in paragraph 34.  That
9  was pled to a misdemeanor assault.  And my investigation of
10 that -- and again, he took matters into his own hand with
11 what he tells me was a fellow selling drugs to children and
12 doing drug dealing at and around the middle school in
13 Belmont.  That was not the right thing to do.

14    THE COURT:  And using brass knuckles.

15    MR. LEDFORD:  Was not the right thing.

16    THE COURT:  Showed a little bit of premeditation.

17    MR. LEDFORD:  It does indeed.  Okay.  He said -- be
18 that as it may, it was pled to a misdemeanor.

19    And, Your Honor, the other thing is the DWI, which
20 is also not -- is certainly not good.  But I did want to make
21 those comments.

22    That was a weird time in America, Your Honor, where
23 a governor of a state is, frankly, suggesting that the
24 President of the United States is conducting military
25 operations in what might -- no one cannot so, but that plan

1    is cool.  That was a weird time in the country.  That's all I

2    have to say about that, Your Honor.

3            THE COURT:  Thank you, Mr. Ledford.

4            Is there a forfeiture in this case?

5            MS. BLACKMON:  It's Document 23.

6            THE COURT:  Thank you.

7            MR. LEDFORD:  There were some --

8            THE COURT:  23.

9            MR. LEDFORD:  There's an agreed order, Your Honor.

10   The one thing, I believe, the Government did agree he could

11   have his ceremonial sword back.

12           MR. SAVAGE:  That's correct, Your Honor.  We want

13   to be able to give that back to the defendant.  We're not

14   forfeiting the sword.

15           MR. LEDFORD:  But I think the order is already in

16   place.

17           THE COURT:  It does appear to be Document 23, and

18   the Court will incorporate it into the judgment in this case.

19         The Court notes the two crimes of conviction do not

20   have identifiable victims.  Society is the victim for both of

21   those cases.  So the -- or both of those counts.  So neither

22   the Justice for All Act or the Mandatory Victim Restitution

23   Act apply.

24         Mr. Campbell, there is a three-step process this

25   Court must go through in determining the appropriate and

 1    reasonable sentence in your case.  This three-step process is
 2    set forth in a series of Supreme Court decisions, starting
 3    with *United States v. Booker*.

 4           The first step in the process, the Court is
 5    required to calculate the advisory guideline range.  As
 6    you're aware, at the beginning of this hearing we did
 7    calculate your range to be 27 to 33 months.  Now, that range
 8    is just advisory.  The Court is not bound by that range, but
 9    the Court must calculate it as the starting point for the
10    analysis of the appropriate sentence in your case.

11           The second step in the process, the Court is
12    required to look through this manual, the U.S. Sentencing
13    Guidelines Manual, and determine if there is a policy
14    statement that suggests a basis for a departure or if there's
15    some other departure set forth throughout this guidelines
16    manual that would be applicable to you that would allow this
17    Court to depart from that range of 27 to 33 months.

18           While the Court has not found any basis for
19    departure that applies to you, there is one basis for
20    departure which can only be initiated by motion of the
21    United States, and that's a substantial assistance departure,
22    a 5K1.1 departure.  And as you are aware, you did provide
23    substantial assistance to the United States, and in the
24    Government's opinion and the Court concurs because it's read
25    the motion.  And the Court is permitted now to depart from

1    that guideline range of 27 to 33 months because the
2    Government has filed a 5K motion.

3            The Court has not ruled on the extent of the
4    departure.  The Court deferred ruling on the extent of the
5    departure until it heard from both counsel.  Now that it's
6    heard about your cooperation, the Court can now determine how
7    far this Court should depart.

8            The Court does want to point out that substantial
9    assistance departures are supposed to focus in on the extent
10   of your cooperation and the courts shouldn't be considering
11   other things that aren't tied to substantial assistance.
12   So -- and I can consider those other things, such as your
13   military service when we get to the third step in the
14   sentencing process.

15           So I focus now on how much substantial assistance
16   did you provide, did it put you at risk by cooperating, did
17   it substantially advance an investigation, such as you
18   testifying in a trial against somebody versus just being
19   debriefed.

20           After hearing from both counsel, the Court does
21   agree that the Government's recommendation of what we refer
22   to in this courtroom as a 25 percent departure seems
23   appropriate.  Let me explain to you a little bit how we get
24   to that.

25           There's no absolute rule on extents of departure.

1    It sometimes it develops as a local custom, so to speak.
2    This Court generally doesn't ever give a departure more than
3    50 percent off the low end of the range.  That's when you
4    cooperate to the maximum extent possible, which not saying
5    you wouldn't have offered to do that here, but I'm sure you
6    would have if you could have.  But those things like
7    suffering injury or putting yourself at risk doesn't occur in
8    your case.  You definitely contributed to Mr. Litteral's
9    guilty plea probably, but you didn't have to testify against
10   him.  That's where you get like a 50 percent departure.
11       A 25 percent departure is a very fair, and in this
12   Court's opinion, reasonable departure where someone tells the
13   Government everything you know about the criminal misconduct
14   and, you know, you're forthright and you were honest and you
15   were timely, and that appears to be true in your case.  So
16   you've earned a 25 percent departure.  It doesn't appear, in
17   this Court's eyes, to be more than a 25 percent departure,
18   but you've certainly earned this 25 percent departure.
19       Now, 25 percent departure from an offense level 17,
20   27 to 33 months down to the Government's -- well, down to
21   25 percent would roughly be to offense level 15, as the
22   Government recognizes, and your criminal history category
23   remains the same.  So the Court now does depart down to
24   offense level 15, criminal history category II, for a new
25   guideline range of 21 to 27 months.

1    Now we go to the third step in the sentencing

2    process.

3    The third step in the sentencing process, the Court

4    is required to consider a series of sentencing factors found

5    at Title 18, United States Code, Section 3553(a). Those

6    sentencing factors were enacted by Congress to guide courts

7    in fashioning sentences that are sufficient, but not greater

8    than necessary, to accomplish the goals of sentencing. The

9    Court has considered all of those sentencing factors. It

10   wants to highlight some that thinks are particularly

11   important in your case, but it does want to point out it has

12   considered all of the sentencing factors.

13   First, the Court wants to discuss your history and

14   characteristics. We've heard about your military service.

15   We are very thankful for your military service. That you

16   came forward after this country was attacked on 9/11

17   voluntarily to enlist and put yourself in a position where

18   you could be deployed into a combat zone and directly put

19   yourself in the line of fire. That's a tribute to you. It's

20   a tribute to all marines. It's a tribute to all the uniforms

21   of uniformed services of the United States.

22   But there's a little bit of irony here too, as

23   Mr. Savage pointed out. We're talking about mishandling --

24   serious felonious mishandling of explosives leading to the

25   development of grenades, you know, operational grenades. And

1    we're talking about kind of reckless disregard for safety
2    around those grenades.  And when I say it's a little ironic,
3    because those of us who have been in uniformed services know,
4    as you know, that safety is an absolute priority when it
5    comes to handling weapons systems.  And that you take great,
6    you know, care in storing weapons properly and in separating,
7    you know, ammunition and explosives from a weapon, making it
8    that much harder for mishaps to occur because, you know, a
9    child can't just come across a loaded weapon, but a weapon
10   that's stored, you know, and properly segregated from
11   explosives.  And explosives, including ammunition, are stored
12   in ways that are extraordinarily safe.  Frequently, as you
13   probably know, bunkers underground.
14            So while your history and characteristics favor you
15   in the sense you voluntarily served your country at a time of
16   need and you served your country well and you received a
17   discharge based on disability, it also is kind of ironic
18   because your history and characteristics also suggests if
19   anyone should not have been involved in this criminal conduct
20   or reckless conduct, it should have been you because you
21   would have had the understanding of the mishandling of
22   weapons systems and of how improper it is to actually build a
23   weapon like a grenade.  So that in some ways that just makes
24   that a neutral factor.  That your military service is
25   dynamous, but you were trained to know not to do what you

1    did.

2              The nature and circumstances of the offense is also

3    troubling to the Court because this was very serious and it

4    could have led to serious injury or death to you, to others

5    around this weapons systems, but also if you got into an

6    incident with law enforcement or some appropriate authority,

7    and luckily that never happened.

8              The Court's also concerned about promoting respect

9    for the law.  We have a, in my opinion -- of course, I'm

10   biased since I'm sitting up here on the bench and I've gone

11   through the process of nomination and confirmation, but I

12   believe we have a very good system in this country.  We have

13   a system designed to allow for vocal protests against our

14   elected officials.  Your protected First Amendment for --

15   where you can peacefully assemble and you can exercise your

16   free speech, and you can make it known to the world that you

17   have serious disagreements about decisions made by our

18   leaders.  At the same time, the beauty of that system

19   requires that we have to realize that we do not resolve our

20   disputes, we do not exercise our disagreements with elected

21   officials by resorting to violence or preparing to resort to

22   violence.  And that's why the Court in this constitutional

23   system believes that promoting respect for the law is a very

24   important sentencing factor as we work through what's the

25   appropriate and reasonable sentence in your case.

1          And that goes back, I think, also to your oath as a

2    marine where you swore to uphold the Constitution of the

3    United States.  And while you could sincerely believe actions

4    of the president were unconstitutional, you certainly have

5    the right to believe that, you also know as a marine that

6    those of uniformed services always salute the very top of the

7    uniformed services and that person is always the

8    commander-in-chief, the president.  That one individual is

9    the only civilian in the chain of command.

10         So the uniformed services have always as a function

11   of our Constitution directly supported the civilian

12   commander-in-chief whether they agreed or disagreed with him,

13   because that's their constitutional duty, so long as the

14   commander-in-chief hasn't done an act that could lead to his

15   impeachment.  And, of course, we have an impeachment process

16   when we have a commander-in-chief that would violate the

17   Constitution.  But you, as an individual, do not have that

18   power.  It comes through a system set forth in 1787 how we

19   remove a president that's violated the Constitution.  And you

20   can support that impeachment process by writing your elected

21   officials.

22         So I think you are extremely sincere.  I think you

23   truly love your wife and your children.  I do want you to be

24   away from them as little as possible, but at the same time,

25   ensure that this Court impose a just sentence for the

criminal conduct you were involved in.  A just sentence is a sentencing factor that's very important to this Court.  And I also am concerned that you are treated similarly to those who conspired with you so if there's any disparity among your sentences, it comes from levels of cooperation or it comes from specific offense level characteristics in the guidelines, but that -- but for the most part, you're similarly -- you're similarly situated and your sentence should be roughly the same subject to these things I just described.

So after hearing argument from both counsel and after going through many of the sentencing factors specifically, the Court wants to emphasize it's considered all of the sentencing factors, but it wants to -- it's highlighted some.

And general deterrence -- I should say general deterrence is a very important one too, because the Court wants to emphasize in this country we resolve our differences without resorting to violence or the threat of violence, and that message has to be sent.  But that after considering all the sentencing factors, some aggravate in your favor, some mitigate -- excuse me.  Some aggravate against you and some mitigate in your favor, but they all seem to lead to the general conclusion that this, in this Court's opinion, there's not one so overwhelming that would justify a variance

from the guideline range. But I also do want to recognize in addition to your cooperation, that you did timely plea and because you did timely plea, which saved the taxpayer a lot of time and money, that the sentence at the low end of the guidelines is appropriate in your case.

With that said, the Court will now state a sentence that's sufficient, but not greater than necessary, to accomplish the goals of sentencing.

The Court invites the attorneys to listen to the proposed sentence before it's actually imposed, so if there's a legal reason why it should not be imposed you can so advise.

The Court proposes the following sentence:

Pursuant to the Sentencing Reform Act of 1984 and *United States v. Booker*, it's the judgment of the Court, having considered the factors noted in 18 U.S.C. Section 3553(a), that defendant, Christopher Todd Campbell, is hereby committed to the custody of the United States Bureau of Prisons to be in prison for a term of 21 months on each count to be served concurrently.

The Court further recommends that the defendant be allowed to participate in any educational and vocational opportunities while incarcerated.

The Court calls the attention of custodial authorities that the defendant has a history of substance

abuse and recommends defendant be allowed to participate in any available substance abuse treatment programs while incarcerated and, if eligible, receive benefit of 18 U.S.C. Section 3621(e)(2).

Upon release from imprisonment, the defendant shall be placed on supervised release for a term of two years. This term consists of terms of two years on each of Counts One and Two. All such terms to run concurrently.

Within 72 hours of release from the custody of the Bureau of Prisons, defendant shall report in person to the probation office in the district to which the defendant is released.

While on supervised release, defendant shall not commit another federal, state, or local crime, and shall comply with the standard conditions that have been adopted by the Court in the Western District of North Carolina.

It is further ordered that the defendant shall pay to the United States a special assessment of $200. The Court finds the defendant does not have the ability to pay a fine or interest. The Court, having considered the factors noted in 18 U.S.C. 3572(a), will waive payment of a fine and interest in this case.

Defendant shall forfeit defendant's interests in any properties identified by the United States. And this Court incorporates by reference the consent judgment of

1    forfeiture, which is Document No. 23 in the Electronic Case

2    File.

3            Payment of the criminal monetary penalties shall be

4    due and payable immediately.  The Court has considered the

5    financial and other information contained in the presentence

6    report and finds that the following is feasible:

7            If the defendant is unable to pay any monetary

8    penalty immediately, during the period of imprisonment

9    payments shall be made through the Federal Bureau of Prison's

10   Inmate Financial Responsibility Program.  Upon release from

11   imprisonment, any remaining balance shall be paid in monthly

12   installments of no less than $50 to commence within 60 days

13   until paid in full.

14           Throughout the period of supervision the probation

15   officer shall monitor defendant's economic circumstances and

16   shall report to the Court with recommendations, as warranted,

17   any material changes that affect the defendant's ability to

18   pay any court ordered penalties.

19           Now, Mr. Ledford, place of designation?

20           MR. LEDFORD:  Your Honor, I'm going to ask the

21   Court to recommend Bennettsville, South Carolina.

22           THE COURT:  The Court would recommend the -- I

23   guess FCI, right?

24           MR. LEDFORD:  Yes, sir.

25           THE COURT:  FCI Bennettsville in South Carolina.

1          Now, I ask counsel is there any legal reason why

2     the sentence should not be imposed as stated?

3          MR. SAVAGE:  No, Your Honor.

4          MR. LEDFORD:  No, Your Honor.

5          THE COURT:  This was a bill of information,

6     correct?  So there's no counts to be dismissed.

7          MR. SAVAGE:  Yes, Your Honor.

8          THE COURT:  Mr. Campbell, in exchange for benefits

9     you receive by entering into the plea agreement with the

10    United States, you have waived your right to contest your

11    conviction and sentence either on direct appeal or in a

12    separate 22 -- Section 2255 motion or also called a habeas

13    corpus motion.  However, you have preserved your right to

14    appeal claims of ineffective assistance of counsel and claims

15    of prosecutorial misconduct.

16         Do you understand this limitation on your right of

17    appeal?

18         THE DEFENDANT:  Yes, Your Honor.

19         THE COURT:  If you do choose to appeal, any notice

20    of appeal must be filed within 14 calendar days from the date

21    of written judgment.  This Court usually hands down the

22    written judgment one to two weeks -- within one to two weeks

23    of this sentencing hearing.  If you're unable to pay for the

24    cost of an appeal, you may apply for leave to appeal at no

25    cost to you.  If you so request, the Clerk of Court will

1    prepare and file a notice of appeal on your behalf.

2           Now, the Court recommends that you talk to

3    Mr. Ledford about these appeal rights and procedures.  Do you

4    understand these appeal rights and procedures as the Court

5    has stated them to you today?

6           THE DEFENDANT:  Yes, Your Honor.

7           THE COURT:  All right.  So you are currently in the

8    custody of the U.S. Marshal Service.  You will be transferred

9    to the U.S. Bureau of Prisons for service of your sentence.

10   That takes anywhere from two weeks to two months.

11          Do you have any questions for the Court?

12          THE DEFENDANT:  No, Your Honor.

13          THE COURT:  Anything else from counsel?

14          MR. SAVAGE:  No, Your Honor.

15          MR. LEDFORD:  Your Honor, I will tell the Court by

16   the time he's designated, he will have about eight months in

17   in service.

18          THE COURT:  Right.

19          MR. LEDFORD:  And the recommendations about the

20   substance abuse may actually slow down his halfway house

21   placement.

22          THE COURT:  That's a possibility.  I'll leave it up

23   to you.  If you want me to strike it, I will.

24          MR. LEDFORD:  Your Honor, I think I would because I

25   had a fellow in Edgefield which is -- and it actually slowed

1   down his getting to a halfway house by six weeks.

2          THE COURT:  I can see that actually.  Yeah.

3          MR. LEDFORD:  And because what they do is when you

4   make that recommendation, they, because on the 21-month

5   sentence on an offense level like this, he's eligible for a

6   halfway house at five months.

7          THE COURT:  Right.

8          MR. LEDFORD:  When you do the math, the real terms

9   is he could be -- he could be eligible for that halfway house

10  as little as 90 to 120 effective calculation of his sentence.

11  Your Honor, I will tell the Court they would keep him at

12  Bennettsville.  My guess is he would be sent to Bennettsville

13  or Edgefield.  Just a guess.  That would keep him actually

14  from becoming eligible for a halfway relocation probably for

15  as much as 45 days.  And, again, there's no guarantee --

16         THE COURT:  Right.

17         MR. LEDFORD:  -- to any of this.  But that's kind

18  of what we experienced with the fellow who was -- part of an

19  insider trading case.

20         THE COURT:  Uhm-hum.

21         MR. LEDFORD:  And it actually slowed him down by 45

22  days.  So I would ask that you not make that recommendation.

23         THE COURT:  I will.  I will strike from the

24  judgment the Court's recommendation to the custodial

25  authorities that the defendant be allowed to participate in

1    available substance abuse treatment.

2              MR. LEDFORD:  And that would also make it less

3    likely that he would get to Bennettsville.  The reason I

4    recommend Bennettsville so it's down the road.

5              THE COURT:  No.  I agree.  It's closer than Butner.

6              MR. LEDFORD:  It is.

7              THE COURT:  I believe it is.

8              MR. LEDFORD:  A bunch.

9              THE COURT:  All right.  Anything else?

10             MR. LEDFORD:  No, Your Honor.

11             MR. SAVAGE:  No, Your Honor.

12             THE COURT:  Then the sentence as proposed is hereby

13   ordered imposed.

14             Good luck to you, sir.

15             THE DEFENDANT:  Thank you, Your Honor.

16             (The proceedings concluded at 10:47 a.m.)

17                          *    *    *

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA

CERTIFICATE OF OFFICIAL REPORTER

I, Jillian M. Turner, RMR, CRR, CLR, Federal Official Court Reporter, in and for the United States District Court for the Western District of North Carolina, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this the 4th day of March 2016.


/s/ Jillian M. Turner
Jillian M. Turner, RMR, CRR, CLR
U.S. Official Court Reporter